2002 ME 9

Tammy CURTIS et al.[1]

v.

**ALLSTATE INSURANCE COMPANY**

Supreme Judicial Court of Maine.

Argued: Dec. 4, 2001.
Decided: Jan. 17, 2002.

---

1. The case caption is changed to recognize the real parties-in-interest to this appeal as reflected in the third-party complaint. The Estate of Loretta Rumney is also a named party.

David Glasser, (orally), Camben, for plaintiff.

James E. Fortin, (orally), Martica S. Douglas, Douglas, Denham, Buccina & Ernst, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] Third-party plaintiffs Tammy Curtis and the Estate of Loretta Rumney (the plaintiffs) appeal from a summary judgment entered in the Superior Court (Waldo County, *Marden, J.*) granting third-party defendant Allstate Insurance Company's motion for summary judgment on the plaintiffs' five-count, amended, third-party complaint. The plaintiffs argue that the Superior Court erred in granting Allstate's motion because (1) the undisputed facts reveal that Allstate breached the insurance contract, violated the Unfair Claims Settlement Practices Act, 24–A M.R.S.A. § 2436–A (2000), and violated the late pay statute, 24–A M.R.S.A. § 2436 (2000), and (2) a genuine issue of material fact exists as to the fraud, Unfair Trade Practices Act, 5 M.R.S.A. §§ 207, 213 (1989 & Pamph.2001), intentional infliction of emotional distress, and punitive damages claims. We affirm the grant of summary judgment.

## I. CASE HISTORY

[¶ 2] On June 23, 1997, Tammy Curtis was injured and Loretta Rumney was killed as a result of a collision between a motor vehicle operated by Curtis in which Rumney was a passenger in a motor vehicle operated by Daniel Christensen. Both Curtis and Rumney sustained damages that exceeded $100,000. At the time of the accident, Christensen was insured under a policy issued by Dairyland Insurance Company with liability limits of $20,000 per person and $40,000 per accident. Curtis and Rumney were insured by Allstate Insurance Company with underinsured motorist (UM) coverage in the amount of $100,000 per person. Allstate's insurance policy provides that damages payable under the policy will be reduced by "all amounts paid by the owner or operator of the uninsured auto or anyone else responsible. This includes all sums paid under the bodily injury liability coverage of this or any other auto policy."

[¶ 3] In September 1997, the attorney representing the plaintiffs demanded in writing that Allstate pay them each $100,000 in UM benefits. This letter was followed by another dated October 9, 1997, which recognized a disagreement with Allstate as to "whether [Allstate] may deduct the entire limits of the liability coverage, even if the claimant is paid less than the entire amount." The letter requested that Allstate pay the plaintiffs the undisputed amounts and agree to allow the plaintiffs to pursue the remaining $40,000 in court.

[¶ 4] Allstate's counsel responded agreeing to pay $160,000, the undisputed portion of the coverage, in exchange for a release by the plaintiffs as to that portion. The plaintiffs' attorney forwarded to Allstate's attorney form releases, both attorneys modified and revised the releases, and the finished products were signed by the plaintiffs on January 2, 1998. The plaintiffs were each paid the undisputed $80,000 by Allstate.

[¶ 5] In February 1998, the plaintiffs' attorney advised Allstate that he had received a settlement offer from Dairyland in the amount of $15,000 each for the plaintiffs. He also stated in that letter that "Allstate must pay to [Ms. Rumney's] estate and to Ms. Curtis the difference between what they receive from Dairyland and $20,000.00," or $5000 each. Allstate consented by letter to the settlement, and indicated that the effect of the settlement would be to "reduce the amount in controversy . . . from $40,000 to $10,000." Because another injured party objected, this settlement was never completed.

[¶ 6] In June 1998, Dairyland filed an interpleader complaint seeking a determination of the rights of the various parties regarding the $40,000 limits of Christensen's policy. The plaintiffs answered and filed a third-party complaint against Allstate demanding payment of the remaining $20,000 per person balance under the UM policy. The Superior Court granted Allstate's motion for summary judgment and held that Allstate's liability was the difference between the limits of the tortfeasor's liability policy and Allstate's UM policy limits.

[¶ 7] The plaintiffs' appeal of that summary judgment was dismissed for lack of a final judgment. *Dairyland Ins. Co. v. Christensen*, 1999 ME 160, ¶ 1, 740 A.2d 43, 43. The plaintiffs then severed the third-party action and filed a second appeal dated December 16, 1999. While the second appeal was pending, the plaintiffs accepted an offer of settlement from Dairyland, conditioned upon certain terms. The amount of that settlement would have reduced the disputed amounts between Allstate and the plaintiffs to $11,357.73.

[¶ 8] During the time the second appeal was pending, we decided *Saucier v. Allstate Ins. Co.*, 1999 ME 197, 742 A.2d 482. Allstate's counsel then conceded that *Saucier* resolved the substantive issue presented by the plaintiffs' appeal against Allstate and offered to pay the $11,357.73 difference between Allstate's remaining UM coverage and the amount the plaintiffs were to receive in their settlement with Christensen.

[¶ 9] The plaintiffs' attorney rejected Allstate's offer and demanded the full amount of the remaining coverage plus interest, threatening to bring suit if that amount was not received. He explained his position that, under *Saucier*, "the UM carrier's obligation to its insured is a primary liability for the entire amount of the coverage (in a policy limits case). Allstate's obligation is, was and always has been $40,000.00 IT IS NOT $40,000.00 MINUS SOME OFFSET!" Regarding the settlement with Dairyland, the plaintiffs' attorney indicated his intent to abandon pursuit of the settlement, stating that his clients would "do nothing further to nego-

tiate or participate in the settlement" and suggested that Allstate take over the suit in the insureds' names under the subrogation provisions of the policy.

[¶ 10] Allstate's attorney responded by letter dated February 1, 2000, reiterating her position "that Allstate's remaining exposure is determined by the amounts received by your clients in the Dairyland settlement." She conveyed her understanding that the plaintiffs had accepted the Dairyland settlement and stated that she would send a check in the amount of $11,357.73 with an acknowledgment that acceptance of the check would not preclude assertion of the plaintiffs' claims for interest and/or additional coverage. The plaintiffs rejected Allstate's offer, and several exchanges between the two attorneys occurred regarding the proposed settlement of the Dairyland interpleader action. The Dairyland settlement efforts failed and the case proceeded to trial, because two passengers declined the settlement offer.

[¶ 11] In early March 2000, Allstate offered to pay the plaintiffs $40,000 in light of "the resulting uncertainty as to the proposed [Dairyland] settlement." In exchange for the $40,000 payment, Allstate's attorney requested an assignment of the plaintiffs' claims to the Dairyland policy and "an assurance of their full cooperation with Allstate in the pursuit of those rights."

[¶ 12] Two checks in the amount of $20,000 were then issued by Allstate and sent to the plaintiffs' attorney. The two attorneys revised the draft release and indemnity agreements that were originally drafted by the plaintiffs' attorney, and the final drafts were signed by the plaintiffs. The second appeal pending before us was then voluntarily dismissed, and the case was remanded to the Superior Court for proceedings consistent with *Saucier.*

[¶ 13] On June 7, 2000, judgment was entered in the interpleader action by the Superior Court, distributing the Dairyland policy limits. In conformity with this order, checks from Dairyland were forwarded to Allstate one month later.[2]

[¶ 14] The plaintiffs' five-count amended third-party complaint[3] alleges: (1) Allstate, by failing to immediately pay the $20,000 per person claims, committed four separate violations of the Unfair Claims Settlement Practices Act (UCSPA), *see* 24–A M.R.S.A. § 2436–A(1)(A)–(C), (E); (2) Allstate violated the late pay statute by failing to pay the plaintiffs' undisputed claims within 30 days, *see id.* § 2436; (3) Allstate breached the terms of the UM contract and the provisions of the releases signed in 1998 that provide for interest on judgments; (4) by requiring the plaintiffs to sign the 1998 releases, which relieved Allstate of its obligation to pay attorney fees, costs and interest on the unpaid balance of their claims, Allstate committed fraud, violated the Maine Unfair Trade Practices Act (UTPA), *see* 5 M.R.S.A. §§ 207, 213, violated the late pay statute, *see* 24–A M.R.S.A. § 2436, and violated the UCSPA, *see id.* § 2436–A(1)(A), (E); and (5) Allstate's refusal to pay the policy limits caused the plaintiffs to suffer severe emotional distress, which entitles them to punitive damages.

---

**2.** Dairyland paid Allstate $20,000 as subrogee for Curtis and $4,650.45 as subrogee for Rumney's estate.

**3.** The plaintiffs originally filed a separate five-count complaint in Superior Court on February 15, 2000. On June 28, 2000, after a hearing on Allstate's motion to dismiss, the Superior Court (*Pierson, J.*) granted the plaintiffs the opportunity to amend their third-party complaint in the interpleader action and took the motion to dismiss under advisement. The plaintiffs' motion for leave to amend their third-party complaint was granted on August 17, 2000, by the Superior Court (*Marsano, J.*).

[¶ 15] Following a hearing on Allstate's motion for summary judgment, the Superior Court in a well reasoned opinion, entered judgment for Allstate on the plaintiffs' amended third-party complaint. The Superior Court found Allstate's conduct to be distinguishable from *Saucier* because "*Saucier* contained fundamental liability issues from the first dollar" and "there was a conclusion by the court [in *Saucier* ] that Allstate was deliberately disregarding its policy provisions by instructions from its corporate leadership." The court also found in this case that Allstate was not unreasonable in its interpretation of case law when, prior to *Saucier*, it took the position that it was entitled to offset its policy limits by the limits of Dairyland's policy. The court stated:

> There is no evidence that Allstate was motivated by malice. Indeed, it very promptly paid the $80,000 to remove any issue of fundamental coverage from the case. It did nothing to prolong litigation nor did it unreasonably delay matters by insisting that it was not required, as a matter of law, to pay its full policy limits and rely on subrogation to resolve its dispute. Indeed, this was clearly recognized by the claimants when they executed the releases and received their $80,000. There is no evidence in this case of corporate "foot-dragging" or any evidence that there is an unreasonable interpretation of law or policy language.

The plaintiffs appeal from that decision.

## II. DISCUSSION

■ [¶ 16] Summary judgment is properly granted when the evidence supporting the claims of the party with the burden of proof at trial is insufficient. If so, the opposing party is entitled to a judgment as a matter of law. *Dumont v.*

*Fleet Bank of Maine,* 2000 ME 197, ¶ 10, 760 A.2d 1049, 1053. We view the evidence in the light most favorable to the nonprevailing party and review the grant of summary judgment de novo for errors of law. *Gove v. Carter,* 2001 ME 126, ¶ 8, 775 A.2d 368, 371.

### A. Breach of Contract

[¶ 17] The plaintiffs contend that Allstate breached the insurance contract by not paying the full $100,000 amount in 1997 upon their demand.[4]

■ [¶ 18] Allstate's insurance policy provides that damages payable under the policy will be reduced by "all amounts paid by the owner or operator of the uninsured auto or anyone else responsible. This includes all sums paid under the bodily injury liability coverage of this or any other auto policy." The policy goes on to state when the damages are payable to the insured:

> We are not obligated to make any payment for bodily injury, sickness, disease or death under this coverage which arises out of the use of an underinsured motor vehicle until after the limits of liability for all liability protection in effect and applicable at the time of the accident have been exhausted by payment of judgments or settlement.

[¶ 19] At the time Allstate paid the plaintiffs the remaining $40,000, there was no settlement with, or judgment against, Dairyland. Because this time-of-payment provision is triggered only when the tortfeasor's liability limits have been exhausted, Allstate did not breach the insurance policy by refusing to pay the amounts in dispute until it realized that settlement

---

4. An interest claim based on the 1998 releases was also asserted, but was withdrawn during oral argument.

efforts with Dairyland would be abandoned.

■ [¶ 20] The plaintiffs claim that *Greenvall v. Maine Mut. Fire Ins. Co.*, 1998 ME 204, 715 A.2d 949, after remand, 2001 ME 180, 788 A.2d 165, overrides this contract provision and that Allstate was improperly requiring settlement with the tortfeasor's insurer as a precondition to payment. *Greenvall*, however, addressed a different issue: whether an insured may bring an action against her UM carrier without first proceeding against the uninsured tortfeasor. *Greenvall*, 1998 ME 204, ¶ 6, 715 A.2d at 952. In *Greenvall*, the insured's estate had received a $100,000 payment from the tortfeasor's insurance company, which represented the full limits of the tortfeasor's policy. *Id.* ¶¶ 2–3, 715 A.2d at 951.

[¶ 21] Interpreting language in the insurance policy that Maine Mutual "will pay under this coverage only after the limits of liability under any applicable bodily injury liability bond or policy have been exhausted *by payment of judgments or settlements*," *Id.* ¶ 7, 715 A.2d at 952, we held that "obtaining a *judgment* against the tortfeasor is not the insured's sole means of establishing legal entitlement to recover for purposes of uninsured motorist coverage." *Id.* ¶ 8, 715 A.2d at 953 (emphasis added). This holding does not invalidate a contract provision, such as the one at issue here, providing that payment of damages is triggered upon the exhaustion of the tortfeasor's policy liability limits by settlement or judgment.

## B. The Maine Unfair Claims Settlement Practices Act

[¶ 22] The plaintiffs contend that Allstate committed four violations of the Maine Unfair Claims Settlement Practices Act, 24–A M.R.S.A. § 2436–A(1)–(2):[5] (1) knowingly misrepresenting its obligations under the insurance contract by refusing to immediately pay the disputed $40,000, § 2436–A(1)(A); (2) failing to acknowledge its obligation to pay and remit the $40,000 within a reasonable time after *Saucier*, § 2436–A(1)(B); (3) requiring the plaintiffs to relitigate Allstate's obligation that was, in effect, "threatening to appeal from an arbitration award to compel them to accept a settlement less than the amount awarded," § 2436–A(1)(C); and (4) failing to pay the $40,000, which after *Saucier* constituted a failure to effectuate a prompt, fair

---

**5.** The Maine Unfair Claims Settlement Practices Act provides, in pertinent part:

1. Civil actions. A person injured by any of the following actions taken by that person's own insurer may bring a civil action and recover damages, together with costs and disbursements, reasonable attorney's fees and interest on damages at the rate of 1 ½% per month;
    A. Knowingly misrepresenting to an insured pertinent facts or policy provisions relating to coverage at issue;
    B. Failing to acknowledge and review claims, which may include payment or denial of a claim, within a reasonable time following receipt of written notice by the insurer of a claim by an insured arising under a policy;
    C. Threatening to appeal from an arbitration award in favor of an insured for the sole purpose of compelling the insured to accept a settlement less than the arbitration award;
    D. Failing to affirm or deny coverage, reserving any appropriate defenses, within a reasonable time after having completed its investigation related to a claim; or
    E. Without just cause, failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear.

2. Without just cause. For the purposes of this section, an insurer acts without just cause if it refuses to settle claims without a reasonable basis to contest liability, the amount of any damages or the extent of any injuries claimed.

24–A M.R.S.A. § 2436–A(1)–(2).

and equitable settlement of the plaintiffs' claims without just cause, § 2436–A(1)(E).

### 1. Knowing Misrepresentation

■ [¶ 23] The UCSPA provides that an insurer is liable to its insured for "[k]nowingly misrepresenting ... pertinent facts or policy provisions relating to coverage at issue." *Id.* § 2436–A(1)(A). The plaintiffs contend that Allstate knowingly misrepresented its insurance policy because (1) Allstate knew or should have known before we decided *Saucier* that it was required to pay the full limits of its policy, or $100,000 per person, under *Greenvall,* 1998 ME 204, ¶¶ 7–8, 715 A.2d at 952, and *Bazinet v. Concord Gen. Mut. Ins. Co.,* 513 A.2d 279, 281 (Me.1986), and (2) Allstate's obligation to pay the plaintiffs the remaining $40,000 was a legal certainty after *Saucier.*[6]

■ [¶ 24] The undisputed facts reveal that Allstate did not knowingly misrepresent the terms of its policy either before or after the *Saucier* decision. To establish a knowing misrepresentation, a plaintiff must provide evidence demonstrating something more than a mere dispute between the insurer and insured as to the meaning of certain policy language. *See Saucier,* 1999 ME 197, ¶ 21, 742 A.2d at 489. Instead, to survive summary judgment the plaintiff must generate an issue of fact that the insurer knew the policy said and meant one thing but told the insured something else. *See id.*

[¶ 25] As discussed above, *Greenvall* does not require the insurer to pay both undisputed and disputed amounts immediately upon demand. In *Bazinet,* we held that, because insurers are jointly and severally liable in cases where two or more insurance policies apply to the same loss, an insured may settle with one carrier for an amount less than that policy's limit and then proceed against her own carrier for the remainder of her damages. *Bazinet,* 513 A.2d at 281. *Bazinet* is limited to the situation in which multiple policies afford uninsured motorist coverage. It is not a global statement regarding the relationships and liabilities between insurance carriers. Contrary to the plaintiffs' contention, therefore, *Bazinet* does not necessarily permit an insured to obtain payment from her own insurer in place of seeking damages from the tortfeasor's insurer.

[¶ 26] The plaintiffs also contend that *Saucier* was dispositive of the conflict between the parties regarding the $40,000 in disputed funds. In *Saucier,* we held that the insurance policy was properly interpreted to permit Allstate to offset only those amounts paid to its insured by the other insurance carrier. *Saucier,* 1999 ME 197, ¶ 16, 742 A.2d at 488. We did not reach the question presented in this case regarding the UM carrier's responsibility where no amounts have yet been paid by the tortfeasor to the insured. Allstate's insurance contract does permit it to delay payment of disputed amounts until the liability limits of the other policy (1) have been exhausted by settlement or judg-

---

**6.** The plaintiffs also seek to impute this Court's determination in *Saucier,* 1999 ME 197, ¶ 19, 742 A.2d at 488, that "Allstate, through its claim analyst, knowingly misrepresented its obligations pursuant to the terms of its policy," because the plaintiffs dealt with the same claim analyst and policy language. That conclusion is not controlling because different parties are involved and the issue of whether Allstate knowingly misrepresented the policy to the plaintiffs was not litigated in

*Saucier. See Cline v. Maine Coast Nordic,* 1999 ME 72, ¶ 9, 728 A.2d 686, 688 (collateral estoppel prevents the relitigation of factual issues between the same parties "if the identical issue was determined by a prior final judgment, and ... the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding"); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1980).

ment, or (2) become subject to a subrogation and cooperation agreement with the insured. Accordingly, Allstate's interpretation of its insurance contract, permitting it to offset amounts in dispute with Dairyland, did not rise to the level of a knowing misrepresentation.

[¶ 27] This case is factually distinguishable from *Saucier*, where Allstate refused to pay even the undisputed amounts to its insured. Allstate promptly paid the plaintiffs the undisputed amounts, and based its dispute of the remaining $40,000 upon its attorney's interpretation of the policy and Maine case law. There is no evidence in the record that Allstate directed either its claim analyst or attorney to disregard the policy provisions; instead, the record reflects only a dispute of interpretation between two attorneys.

2. Failure to Pay Within a Reasonable Time

■ [¶ 28] The plaintiffs argue that the undisputed facts establish that Allstate failed to acknowledge its obligation to pay the additional $40,000 within a reasonable time after the *Saucier* decision. Section 2436–A(1)(B) provides that an insurer may be liable to its own insured for "[f]ailing to acknowledge and review claims, which may include payment or denial of a claim, within a reasonable time following receipt of written notice by the insurer of a claim by an insured arising under a policy." 24–A M.R.S.A. § 2436–A(1)(B).

[¶ 29] The correspondence in the record reveals that the Dairyland settlement did not fail until February 24, 2000, when two of the injured parties would not agree to its proposed terms. Allstate acknowledged its obligation to pay the full $20,000 per person on March 3, 2000, after it learned that the underlying action had not settled. The only inference to be drawn from those two facts is that Allstate was informed at some point during those eight

days that the case did not settle and determined that an offer of the full amount was, therefore, appropriate. The Superior Court correctly concluded that Allstate paid the plaintiffs' claims within a reasonable amount of time.

3. Threatening to Appeal From an Arbitration Award

■ [¶ 30] An insurer is liable under the UCSPA for "[t]hreatening to appeal from an arbitration award in favor of an insured for the sole purpose of compelling the insured to accept a settlement less than the arbitration award." *Id.* § 2436–A(1)(C). The plaintiffs contend that the litigation regarding the remaining UM coverage after *Saucier* was decided in favor of the insured was equivalent to threatening to appeal from an arbitration award.

[¶ 31] The language of the UCSPA provision at issue is not ambiguous: an insurer may be liable for threatening to appeal an *arbitration award* rendered in favor of the insured. Here, there is no arbitration award. The Superior Court was correct in granting Allstate's motion for summary judgment on this issue.

4. Failure to Effectuate a Prompt Settlement

■ [¶ 32] The UCSPA provides that an insurer is liable if, without just cause, it fails "to effectuate a prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear." *Id.* § 2436–A(1)(E). "[A]n insurer acts without just cause if it refuses to settle claims without a reasonable basis to contest liability, the amount of any damages or the extent of the injuries claimed." *Id.* § 2436–A(2). The plaintiffs argue that Allstate's failure to pay the remaining $40,000 UM benefits after the *Saucier* decision constitutes a violation of this section.

[¶ 33] Contrary to the plaintiffs' assertion, *Saucier* did not compel Allstate to immediately render payment to the plaintiffs in the full amount of its liability limits. We held in *Saucier* that, pursuant to its policy, Allstate was entitled to deduct only the amounts paid to the insured by the underinsured's carrier. *Saucier*, 1999 ME 197, ¶ 12, 742 A.2d at 486. The basis that Allstate's attorney asserted in the post-*Saucier* letters for not immediately offering the entire $20,000 per person, was that a settlement was pending in the underlying interpleader action, which would allow Allstate to offset from its liability limits the amounts received by the plaintiffs. This was a reasonable basis for contesting liability, and there is nothing in the record to contradict that basis. Accordingly, the Superior Court did not err in entering summary judgment for Allstate on this issue.[7]

## C. Late Pay Statute

[¶ 34] The late pay statute provides that a "claim for payment of benefits under a policy or certificate of insurance delivered or issued for delivery in this State is payable within 30 days after proof of loss is received by the insurer." 24–A M.R.S.A. § 2436(1). The 30 day period is tolled, however, if the insurer notifies the insured, orally or in writing, that it disputes the claim. *See id.; Depositors Trust Co. v. Farm Family Life Ins. Co.*, 445 A.2d 1014, 1018 (Me.1982). The plaintiffs argue that because the dispute was not based upon a reasonable investigation of the claim as required by 24–A M.R.S.A.

§ 2436(2), the $20,000 in payments were overdue and the plaintiffs are entitled to interest and attorney fees pursuant to sections 3 and 4 of the statute.

[¶ 35] The existence of a legitimate controversy between the parties tolled the 30–day time period for payment. The record reveals that Allstate's position regarding the disputed amounts was based upon an interpretation of the insurance policy and Maine case law, an interpretation later accepted by the Superior Court when it granted Allstate's first motion for summary judgment. Allstate's conduct was, therefore, not a violation of the late pay statute.

## D. Fraud

[¶ 36] Allstate would be liable for fraud if it: (1) made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of its truth or falsity; (4) for the purpose of inducing the plaintiffs to act or to refrain from acting in reliance upon the representation; and (5) the plaintiffs justifiably relied upon the representation as true and acted upon it to their detriment. *See Francis v. Stinson*, 2000 ME 173, ¶ 38, 760 A.2d 209, 217.

[¶ 37] In light of our determination that Allstate did not misrepresent the terms of its policy, the plaintiffs have failed to establish a prima facie case of fraud. Because the fraud claim did not survive, the Superior Court properly granted summary judgment on the plaintiffs' claims for intentional infliction of emotional distress

---

7. The plaintiffs assert that additional facts may exist to support the lack of just cause, but that Allstate filed a motion for summary judgment before the commencement of discovery. A defending party may move for summary judgment at any time. M.R. Civ. P. 56(b). Because the plaintiffs did not file a motion requesting the court to refuse the application for judgment or to continue the motion for summary judgment pursuant to M.R. Civ. P. 56(f), and instead merely requested more time for discovery in a paragraph of their attorney's affidavit, we find no error in the consideration of Allstate's motion for summary judgment. *See* M.R. Civ. P. 7(b)(1); *Procise v. Electric Mut. Liab. Ins. Co.*, 494 A.2d 1375, 1380 (Me.1985) (plaintiff's motion for leave to pursue further discovery properly denied).

and punitive damages. *See Stull v. First Am. Title Ins. Co.*, 2000 ME 21, ¶ 14, 745 A.2d 975, 980; *Colford v. Chubb Life Ins. Co.*, 687 A.2d 609, 616 (Me.1996).

### E. Unfair Trade Practices

[¶ 38] A purchaser of personal, family or household goods, services, or property who suffers any loss of money or property as a result of an unfair or deceptive act committed in the conduct of trade may maintain an action pursuant to the UTPA. 5 M.R.S.A. §§ 207, 213. The amended third-party complaint alleges that requiring the plaintiffs to sign the 1998 releases in exchange for receiving the undisputed $80,000 amounts was an unfair and deceptive trade practice. Even if requiring the execution of a release could be considered a deceptive act, the plaintiffs' statement of material facts is completely devoid of any evidence that they suffered a loss of money or property as a result of signing the releases. The failure to establish a loss of money or property as a result of Allstate's actions, an essential element of the claim, is fatal to the UTPA claim. *See Tungate v. MacLean–Stevens Studios, Inc.*, 1998 ME 162, ¶ 13, 714 A.2d 792, 797–98 (plain language of UTPA statute denies relief to plaintiffs who cannot show loss of money or property).

The entry is:

Judgment affirmed.

